First case on our call this morning is case number 106537, agenda number 8. You may argue. Good morning. My name is Mark Rogazio and I represent Francis and Scott Halpin. Scott and Chris Halpin are here today in court and so is a member of the Christians and family. Mr. Schultz is here. This case was filed, heard, and tried under the Illinois Drainage Code Act. It's actually called the Illinois Drainage Code, but it was codified in 1956. The factual issues involved in this case are quite simple. Water, as oftentimes humans, enjoy a path of least resistance. Unless artificially altered, water normally flows downhill. The legislature in 1956 codified an act called the Illinois Drainage Act. And what that was designed to do was design to resolve disputes normally amongst neighboring landowners, normally farmers, to relieve water from a higher elevation of land to a lower elevation of land, to an even lower elevation of land, to a natural or artificial drainage or waterway. That's all well and good as long as it doesn't interfere with the lower landowner's property. Does that code require a finding for a defendant if there's no evidence as to where the water is being discharged? The code requires that the plaintiff prove, I'll cite the section for you, Your Honor. It's Chapter 70, ILCS 605, 2-5. It requires that the plaintiff prevail if any other outlet which the plaintiff has the right to use. In other words, he must release the water from his property which is accumulating and going through the neighboring property to an outlet. I don't see where the act requires a specific discharge point. Mr. Ragazio, is there a different standard or a different rule under the code for new construction as opposed to repairing? And is this a new construction case or is this a repairing or maintenance case? This is a repairing and maintenance case of which the evidence showed that the drain tile had been in place. I believe we had alleged for approximately 100 years. If it's a maintenance, if it is a maintenance and repair case, does there have to be evidence in the record that the drainage tiles from the higher ground are connected to the drainage tiles from the lower? I believe you are correct, Your Honor. There does have to be evidence? I believe there is, yes. And I think we established that requirement through Richard Weprick, which the circuit court found to be a tile expert. The shooting of the elevation through the engineer, Guy Christensen. If you look at the evidence show that they actually dug down and found the tiles going from the existing property of the Halpins and Christensens through the Peter Schultz property and then they stopped at the end of Peter Schultz property because if you notice from the appellate court's ruling, the final property in the length was James Schultz property who chose to default, not enter an appearance or an answer in this case because he felt it would benefit his property. The reason why we are here is the court, Judge Marcellia, the third district circuit court found that by a preponderance of evidence, the natural flow of water was from the Christensen Halpin and Schultz property, period. That is the only question that was presented to him. The evidence in order to prove that was the engineer, the tile expert, and Mr. Roger Christensen whose family owned the property for approximately 60 years. The defendant represented himself, it's the right to do that, presented no engineer, no tile expert, and I believe his sole evidence was at one time or another I saw the water flow to the east. I did not see the water flow in accordance with what the plaintiff's witnesses are testifying to. Was that testimony? Pardon me? Was that testimony? That was the argument of the defendant. There was not one witness, but he called to show the water flowed to the east. What I'm suggesting to you folks is that at the appellate court level, the third district appellate court retried the facts of this case. They in essence usurped and disregarded the factual findings of Judge Marcellia at the circuit court level. The court at the circuit court level, ruling is to be upheld as you know unless it is a misuse of discretion. If he finds, and he did, by a preponderance of the evidence the natural flow of water was to the northeast, and he did, then his ruling should have been upheld. His ruling is in the material in front of you, September 5th of 2006, states the plaintiffs have established by a preponderance of the evidence that the natural flow of water is from the south to the northeast. This means that the water flows from the Halpin and Christensen's property over and through the Peter Schultz property and the James Schultz property. This is clearly shown by the testimony of Roger Christensen and Guy Christensen, see Exhibits 7 and 9. He went even further in his ruling, which again was very concise, that he found Richard Weprick, who had been in tile business I believe testimony was and the evidence was found to be for 40 years, to be a, quote, tile expert. At every stage of the trial court level it was asked, and you can see in the record, to Mr. Schultz, do you have a witness, a document, an exhibit, or some piece of evidence to refute what Mr. Guy Christensen said, what Mr. Weprick said, or what Mr. Roger Christensen said. In each stage, yes, sir. Your point is basically as simple as this, that the trial court's ruling was not against the manifest weight of the evidence. Yes, sir. And that's basically your argument. That is it in a nutshell, Your Honor. And I'm suggesting that the tiered system that we have is one in which, I'm not enlightening, I'm just regurgitating, that the legislature sets the law, and they did in 1956, presumably to resolve disputes of which were here. The circuit court, if there is a dispute, decides the evidence. Unless there is an abuse by the circuit court, the appellate court is to uphold the circuit court's ruling. In my opinion, the appellate court of the third district has set a rather dangerous precedent here by attempting to, and actually retrying the case on behalf of the litigants. It does appear, Mr. Schultz represented himself pro se, and that's fine. He has every right to do so. Counsel, if I may. Yes. I think that the appellate court tried to determine whether or not the plaintiff had complied with the statute. Is that correct? The appellate court, yes. And one of the things that they said in their opinion was that there was no identified point of discharge. That is, you are correct. And is there a question whether or not we can consider that argument? I don't believe that was raised, Your Honor, at the appellate court level by the appellant at the appellate court level, Mr. Schultz. But that's not what the statute says, that the plaintiff approved any other outlet which the plaintiff has a right to use. The outlet that was proven was the outlet through James Schultz's property. He is the only person who actually would have standing to object to the discharge. The statute doesn't even say discharge. It says outlet, but that might be a matter of semantics. I don't believe that was raised, though, at that point. Right. But you also believe even if it was germane, you would win because it went through Peter's land. Is that correct? It went through Peter's land and the three outlet points that could possibly come out at James Schultz's property, which are north of Peter's property. There's three pipes there. When Wettbrecht went through and cut the tile and looked at the water, the water flowed to the northeast, and the water was flowing and not backing up. So the assumption, we call it circumstantial evidence, would be that there was an outlet, one of the three tiles which was on James Schultz's property. But I don't think that issue is even one that was addressed at the appellate court. I think the issue is what was the natural flow of the water. The appellate court also chose to make a comment, and I think it was almost in an addictive fashion, that we somehow, the Halpins and Christiansens, were attempting to deprive Mr. Schultz of his property. And they cited a case, and I believe it's a 1910 case, People v. Sayers, I don't know if this court has had an opportunity to review that case or the facts of that case at all. That case was a clear trespass case where one landowner went on to another landowner's property to hunt and kill game, which was probably a more significant thing at the time. There was no notice. There was nothing of that nature given. In this particular case, the lawsuit was filed months before we went on to the property of Mr. Schultz to look at the tile. We had court orders to go on to the property. We had letters, as is first outlined initially in Justice Holdrich's dissent, requesting a cooperation agreement. We finally did go through the entire trial and proved all of the elements under the act that were necessary to prove. And what I'm suggesting very simply, as Justice Thomas has said, is very simply that the appellate court overstepped its mounds and overruled the circuit court and put themselves in the place of the trier of fact. I understand that you think that the only issue then before us is whether or not the flow of water finding was against the weight of the evidence or the trial court was right on that issue. It seems to me the appellate court went to a number of things under the drainage code, and one had to do with damages. Was it incumbent, if we go further than just the issue of whether the trial court's finding was right on the flow, is it incumbent upon us or is it necessary for us to look at whether there should have been a determination of damages prior to the repair or is that an issue that comes up after? It would have to come up after. And analogies are probably the best sometimes in answering questions. If you construct or contract with someone to build a home, and the first thing you do in building a home after your plans are you have an excavation of the foundation. Initially, there's going to be a disruption of your property to do the foundation. There's going to be dirt all over the place. There's going to be ruts. There's going to be trucks, et cetera. Eventually, when your foundation is poured and the backfill is put in, all of that matter is then taken care of. So will there initially be some disruption of the property? Well, sure. You have to put in a drain tile. You have to replace a hundred-year-old drain tile with new methods that we have now with trucks and the way they put them in an automation system. So to answer your question, yes, we would have to wait until the conclusion of the tile being placed on behalf of the Christiansons and Halpins to determine if there was any damage to the Schultz property. By the same token, the Act also provides if after that tile is placed there's any interference by the lower landowners, Mr. Schultz or otherwise, the plaintiffs, the Halpins and the Christiansons, likewise, would be able to bring an action for damages. So it kind of works both ways. But it would be impossible to determine, to answer your question, until the tile were put in. There are provisions of the Drainage Code that talk about drains and levees for mutual benefits. And you alluded to testimony of a drainage field or tile that had been there for a hundred years. Is there any evidence in the record as to whether this was constructed for the mutual benefit or how this initially came about? It's my understanding from where the evidence came in, this was all one piece of property at one time years ago and then sold off to the Schultz Christiansons, a piece to the Halpins, a piece to the Grant Brothers to build, I think, 16 lots on the east side of the property we're talking about. So it would have to, yes, I would have to believe that since the property was all in one ownership, it was for the mutual benefit of that party and then presumably inherited by the subsequent landowners who purchased the property. I think that reading the opinion of the majority of the third district is that there was some, Mr. Schultz represented himself to trial and he did a very fine job. In fact, he did an excellent job being pro se. But he didn't call witnesses to refute the witnesses, testimony, documents and exhibits that were shown to prove the natural flow of the water. It seems to me in reading the majority's opinion, the dissent alludes to a dissent by Justice Holdrich, that there was a leniency given to Mr. Schultz because he was pro se. A leniency given to him by the majority. Justice Holdrich cites a case in which we have new material and he has his opinion, which indicates obviously we know that the laws do not treat a pro se plaintiff or defendant with any more or less burden than they would if they were represented by counsel. I'm asking you to find that the appellate court abused their discretion in overturning the decision of Judge Marcellia in favor of Scott and Frank Halpin. And unless there's any more questions, thank you for your time. Thank you, counsel. Mr. Schultz. May it please the court. My name is Pete Schultz. I did defend myself. I wish I had a lawyer on it. I know they're a lot smarter than I am and I really wish I had someone that knew what they were doing. But I did the best I could because of financial. I got a wife and daughters and anyone that's got that knows what it is. Hopefully college, 13 or 14 years old. So that's where I'm sitting with my daughters right now. But what I'm looking at right now is Mr. Regazio said that they had permission and everything else. I'm not quite sure. But I'll just start right out with first of all, when Roger Christensen was on stand, Roger stated he's had to land 58 years of his life and in the last 100 years that it's been drained and somewhere along the line it was 50 years it's been drained. But the bottom line was is when I went back after Roger, when I cross examined Roger, Roger stated yes, the 100 acres was turned into a subdivision. Yes, there's 16 lots built. They plotted the whole 100 acres into a residential development. They put no retaining ponds. They put nothing to take care of the storm sewage. Actually, Roger, after they started having their issues, once they closed the ditch along the east side of their property, which borders Costa Road, they've had a lot of drainage issues because the water would always flow towards the east. And as the water flowed to the east, it hit the ditch. And so much of the ditch, there's a high point in their field, which Guy Christensen is also the engineer to the village of South Wilmington. And Guy Christensen stated that the water flows to the south and flows to the north when we were at a meeting in the village of South Wilmington. Is this testimony in the record, do you know? Yes, everything. Evidence that you introduced through cross examination, is that? That's correct. Okay, thank you. Yes. And anyhow, going back to, let me start with Roger Christensen first and stick right to what Roger stated as far as his change. He said there was no changes, which we know. Also, they put in what you call a CRP program. They put it in. And he stated that they had seeping tiles and so forth and so on, whatever the CPR. And I did check with the Department of Agricultural, and they said that if everything Roger was saying was true on that, and everything's true, that that pond should have been put way over at the very northeast corner of the farm, which the pond is out in the center of the farm. So according, they kind of self-conflict themselves as far as the drainage. Anyhow, but Roger also stated that there was no other changes. Yes, there was a building of the 16 houses, or lots of the 16 houses that's going to go in. I think there's 14 or 15 houses. Actually, Scott Helping owns one of the houses. And when we were in court, I even brought up when they put the drainage in, and then Guy Christensen was there talking about the drainage, how it's all proper. Since they got done building the houses, actually the house where Scott has, they went out in front because they felt that the manholes in front were too low. They'd been raising the manholes as they'd been filling their yards full. So now they've got more issues. And in fact, even after we came out of the trial court, they had to go and lower that manhole in front of Chris Helping's house. So they're aware of their issues. If the 100 acres of land was all 100% agricultural land, as it was for the last 100 years as they speak, we wouldn't be here today. Once they started the subdivision, that's where the issue became. I'm not going to beat on Roger because you guys read my brief on Roger. As far as Guy Christensen, Guy Christensen never really was brought up. Guy Christensen is the engineer for the village of Saltonwoodton. He's also an engineer throughout the county. He does a lot of the county engineering. And I would say he's probably really a good engineer. But he stated that he was on my property. From what I understand, they were on the property two times, saying they never did see him myself. The one time they were on the property was January 14th of 2006. They had a court order to go out there and put a probe in the ground, and that's all they were supposed to do is probe the ground. And so they supposedly did that. I did not see them do that. And they did call. They did give me the insurance thing. So on January 14th, they did the probing. Somewhere along the line on February 7th of 2006, there was no longer a court order, no phone call to me, no nothing. With the support of Grundy County Sheriff's Department, they went out there with a backhoe. And as stated, I think, let me see, I know for sure that, and I told Mark, it was right in the summary judgment, C-52, C-53. I stated I had many working tiles in my field. My field has a lot of good working tiles. And I stated I do not want anybody digging my tiles. I didn't even want them probing. But on February 7th, 2006, they went out there with a backhoe. They did probe, and they did find my tile. So what they decided to do is go through and just randomly dig through and destroy my tile probably about every 500 feet, which I wasn't there to do nothing about. I had a brother that stopped by. He took pictures. But the sheriff card there, he didn't want to say a whole lot. So he contacted me as soon as he could. So when I came home, I got a hold of the sheriff's department and said, hey, I need to press charges against somebody here. He said, well, they've got a court order. I said, well, can I see the court order? He said, you don't need to see the court order. I said, come on. And so the deputy and myself got out. So I called the sheriff up. I said, sheriff, actually the day Sheriff Terry McKinney wasn't in, but when he came in, I talked to Sheriff Terry McKinney. I said, Terry, what's up? And Terry was like, Pete, why do you want to be such a – I didn't even want to say what he called me because he called me a swear word. It starts with a J and ends with O. I mean, J-A-C-K-O-F-F. So he called me. He says, Pete, why are you against Frankie Helton going on your property? I said, I'm not. I said, I just don't want him destroying my title. He needs to be arrested. He says, I ain't going to have him arrested. He says, you know, do you know who he is? You need to be afraid of him. You know, he's the Grundy County – at that time he was, I think, just a board member. Now he is the president. Frankie Helton is now the president. So anyhow, I was like, okay, Terry, whatever. You know, so Terry won't do nothing. So I did contact Lisa Mannigan. I contacted Sheriff – State's Attorney of Grundy County, it's Oval. I tried my hardest to get something resolved in it. It didn't happen. I mean, Mr. Schultz, is it, in its essence, your argument that the drainage doesn't flow naturally across your land? Absolutely not. No, it does not. No, it – no. And it flowed to the east when it hit the ditch. That's where it went. And my land flows to the north. And Mark stated that James Schultz's land is to my north, and it is. Then there's also, just for the record, there's three James Schultz's. I have a dad that's James Schultz. Mello and his show X. He goes by – Mello's name is X. He goes by X. I have a brother by the name of James Roger. Mello's name Roger R. And then there's Jimmy Dean. James Roger Schultz will not allow them on the property either. They've never been on his property. That is where my tiles go through. Through James D. Schultz, they supposedly went on there. He basically didn't want to involve himself in court because he works. He's got a wife and a family, so he don't want to be saying what I'm doing right now. Did this land drain across your land before the subdivision was built? No. So the subdivision is pretty much irrelevant to this? The subdivision, yeah, the subdivision, they built the houses up, and now when it hits the subdivision, it's running across my land. Did, in fact, the trial court find that the drainage naturally was to the north, northeast, from the Christensen property across yours? Was that the finding of the trial court? That was through the testimony of Roger Christensen. Was that the finding? Is that what the trial court found in its order? I believe they said it did, but they also said it did go to the east. And that's what you appealed to the appellate court, that finding, as to whether it flowed to the north, northeast. Correct. And then also, they also, when they said they were going to put the new drain in, they did say there was no outlet. They have no outlet. So that was another one of my complaints as far as no outlet. Mr. Schultz, was there a topographical map admitted into evidence? Yeah, the one that I, it's one that they presented, and I got a copy of it. And did that show the flow to the east? Yes, it did. And it's on my brief, you guys all got a copy of that, and my brief was just page, they got a big one. It was the C-43 and also the Petitioner's Exhibit 9. You guys all got a copy of this right here. And if you look at the things, I even put a little thing down here, 586 showed it all came to the east. Across the front here is where the new houses are at. So anyhow. And what experts testified for them that it was north, northeast? Correct. And their expert was the Roger Christensen and then Guy Christensen, which I honestly, I state it in my brief, Guy Christensen I don't believe ever was on my property. I don't know where he got his information from, but he never was. The one day when they were on the property digging with the backhoe, even Richard Rittbrecht said that it was just him and his son doing the digging. And so there was no Guy Christensen there. So I was kind of puzzled as far as their experts, even as far as what their drainage code that Mr. Regazio was talking about, it even states in there that if the ditch can't handle it, then it would come back towards me, that it would be in my favor. I did talk to the road commissioner, which is the highway authority. His name is Ken Lampert. And the ditch that where my drainage tile is drained through, it don't handle enough of my field. My field don't even, when it drains, as of last week when we got these heavy rains, it's backed up on my field big time. And he stated that until they clean that ditch all the way out that there's issues. And I have talked to him about cleaning that, but he's not doing much about it. But as far as Mr. Regazio, Mr. Halpin, in their brief they state they want to come out on Rice Road. And I personally feel that's a good thing. If they go out on Rice Road, which is to their south, they would stay away from my property. I won't have to be bothered. They can also go towards Coster Road because as they put the subdivision in, they have access where they've got two streets coming into it. They've got Lake Street and then there's one of the other streets of the town comes into it. So they have access to go the way they need to go. They could run their tiles to the east and do it and stay off my property. Mr. Schultz, the drainage code I think can be interpreted to provide different things for new construction and different things for existing tile and even perhaps different things if it's a tile field that was put in for the mutual benefit of property. And I refer you to Section 2-2, which says the person desiring to construct the drain may file suit. And then Paragraph 2-3 talks about a bond at the time of commencing the action, which is I would understand it to be the action to construct the drain. And Paragraph 2-4 refers to at the time of commencing the action. And then Paragraph 2-5, which provides for all of the findings that the appellate court said that the trial court failed to find, it says if on the trial of the case, still I think referring to the case for new construction, if it doesn't find certain things including an outlet or a discharge, then maybe the plaintiff will not win. However, if you go to the sections of the statute, the drainage code that talks about maintaining and repairing, there's no requirements for that finding. I'd like your thought on this possibility. Would that be because if there is an existing drain field, those findings were already made at the time that the drainage was initially put under the land or into the land, and therefore the findings are no longer necessary? And that's also consistent with the argument that Mr. Rugazio made that this was one tract of land, the field tile were put in for the benefit of the entire tract, and therefore discharge was established at that time. Specifically, my question is, is it necessary for the trial court in this case to have found that there was an outlet or a discharge when it's to repair an existing field, trial tile field? I would say they would need to, yes. The outlet that's there right now, which Mr. Rugazio said was all one tract, is pertaining to the Schultz property, which is the 180 acres. That land was owned by Mr. Llewellyn Wilson. He owned it for several, through his life and his dad's life, it was inherited from his dad. They were the ones that put the drainage on my land. As I showed in the maps, which you guys got a copy of, as far as Mr. Rugazio, which is my page 11, which is the C92 in the Petitioner's Exhibit 7, that's what they're trying to do, is they're trying to say that their land drains from my land.  It'd be like in your house if you've got your plumbing and you've got your bathtub and your sink and you've got everything all going through it. If you live in, say, a duplex and the people next door have an issue with their bathtub, sure, they would love to tie on to your drain, so they don't really care if everything in yours works, but then if they tie in that don't quite work enough, they'll just put in a new line, but they're not going to hook everything back up. If they would come through, as Mr. Rugazio says, and just completely destroy everything in mine where my tile is all tied in, they would no longer tie in because he would just come in with his big ripping machine and rip through. So basically, I do not want my land to be an easement for their land when they have other options and they're the ones with their subdivision that has the issues. They have many issues with the drainage. The whole village of South Wilmington has issues with the drainage. It's one of the reasons I think Mr. Guy Christensen kind of jumped on board because when it rains hard, like last week, South Wilmington gets flooded pretty bad. They've got the Meson Creek coming through and it gets flooded bad. I'm not sure if I understood Mr. Rugazio correctly, but I thought the allusion to the land being one track included the Christensen land as well as the Schultz land, that that was all one track at one time. Is that part of the record or do you know? That is not part of the record. I think Mr. Rugazio said that, but I mean, if you take a whole section of land, which is 640 acres, you have ditches from around the whole land and usually you go to the shortest area and it's understandable. But now, you know, he's wanting to take all the way to the very southwest corner and drain it all the way towards the northeast corner? I don't think so. You know, I mean, there's ditches. Last week when it was flooding, you could see the water naturally going every which way. It's getting off the property through all the ditches. All the ditches was full of water. I mean, it would be, no, I would say that's completely a false statement of Mr. Rugazio saying that that drains from my land. So other than that, that's really that I believe that's all I've got to say. And thank you guys. And I just hope that you guys agree with the appellate court. Thank you. Thank you, Mr. Shultz. Mr. Rugazio, you may proceed. Thank you. In regards to rebuttal, there seem to be a few questions, and Justice Thomas, you had asked one which was kind of directed towards the elevations of the land and how we determined it went from the Christensen-Halpin to the northeast over Pete's property through the Shultz property. Well, the only evidence presented, and it's on page 9 of the opinion, is that five elevations were measured. And I'll tell you how those five elevations were measured, and it's in the record. Weprick, the tile expert, came out and located the tile through Christensen-Halpin and Pete's property. And it's kind of unique. I didn't know you could do this. With clay tile, you go down with a probe, and the probe goes down and hits the tile, and when it comes up orange, you're hitting clay tile. We don't have clay tile anymore. We probably haven't for 20 years. We have corrugated tile. Well, he went down and found the clay tile at five different elevation points, took a backhoe, dug down, and sure enough, there's the tile going to the northeast through Halpin-Christensen and Pete's property. We didn't stop there. We asked Guy Christensen's folks to go out and shoot elevations, and he shot those, and the elevations, sure enough, are 586 feet, 77 inches, 585.12, 584, on down to 583.78. If you look at the record, Judge Marcellia asked a very astute question that, not being a tile guy, I thought was astute. He said, at that short of a drop over that distance, would that be enough natural flow of water for an eight-inch clay tile, and then the corrugated tile, I think was discussed later, had to be 12-inch because corrugation holds back some of the water. And sure enough, his testimony was, yes, that would be enough for a natural flow. And the tile is there already. To address Justice Carminer's question, it had to be for the mutual benefit of one piece of property, if it was one at the time, or if it was sold off. Or if the two landowners, if it wasn't one, I believe in the record it was one piece of property at the time years ago, if it wasn't, then the two landowners had to get together and agree that this tile flowed from the property, which is now Halpenson Christensen, through Pete's property, and then through James Shull's property. I think, Justice Carminer, your concern was, was there a discharge point? Did it have to be proven? Was it proven? So on and so forth. If you look at the testimony of Guy Christensen, Guy said that it appears, he's a certified engineer, that the water comes out at Main Road near the corner of Main and Coster. That's the most northeast point we have in this entire equation. There were topographical maps which were given at the time of trial and were put into evidence. There was evidence of Weprick's digs, which followed those topographical maps. There was elevations that followed the topographical maps and the digs, all showing that the water went in that northeasterly fashion over Pete's property. I know Pete doesn't like the invasion of maybe a backhoe going over his property to put in some new drainage tile. The Halpins probably don't either because for them to run the tile straight east, as Pete would suggest, would be about twice the distance from here to that wall. It would be a lot cheaper, but that's the natural flow of water. They can't do it that way. They're utilizing the existing tile that was there for, uncontradicted, there was for about 100 years. Roger Christensen testified absent the tile. Back in the 60s, it was a 7-inch rain in a 24-hour period, which we all know is quite a bit. He went out there. He looked at different sites, and the water absent the tile, you can't see down below the ground, was flowing with the corn cobs and the stalks towards the northeast. He testified that in his lifetime, since there's been big rains, it's never flowed any other way. One of Pete's concerns was that the damage was done by Mr. Weprick when he went in and dug up one of the tiles. Yeah, there was damage. At one of the five digs, there was damage. What Mr. Weprick did, though, is not only take photographs of the damage he did, come into court and admit the damage, he repaired it with a new corrugated tile, and the court found the deficiencies in the tile from Mr. Weprick's digging was not caused by Weprick's digging, and it was clearly in need of repair, and he testified he repaired it. So it sounded like whether Weprick repaired it or, I'm sorry, disrupted or interfered with it, he nonetheless took it upon himself to repair it so that the water continued to flow. There's a drainage tile going through the Halpinson Christian property through Pete's property. It's been there for 100 years regardless of who owned the property. That's what the judge found. If there's any damage at the end of the digging and the placement of tile, which I have to say is for the benefit of everybody, it will be addressed, and the court did leave that open. The sole issue, did the court find by a preponderance of the evidence that the water flowed in accordance with the way that the plaintiffs, Halpinson Christiansons, presented their evidence? The answer was yes. The appellate court somehow said no. I don't think that's within their province of doing that. If we get into that, we've somewhat eradicated our system from, again, the legislature making the laws, circuit court judge hearing the evidence, appellate court interpreting error, and you folks determining if the appellate court stepped out of bounds. Thank you for your time. Thank you, counsel. Case number 106-537, Francis Halpin v. Peter Schultz.